UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| STEVEN L. SCHOONOVER | CIVIL ACTION NO. 15-2917 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| HALLWOOD FINANCIAL LTD., ET AL. | MAGISTRATE JUDGE HAYES |

**MEMORANDUM RULING**

Before the Court is a bankruptcy appeal filed by Appellant, Steven L. Schoonover ("Schoonover"), appealing the bankruptcy court's Judgment on Partial Findings and Judgment in favor of Appellees, Hallwood Financial Limited ("HFL") and Hallwood Modular Buildings, LLC ("HMB" and collectively, the "Hallwood"), dismissing his claims of detrimental reliance and promissory estoppel, breach of contract, and unjust enrichment. See Record Document 1. Schoonover argues only that the bankruptcy court erred in dismissing his detrimental reliance claim. See Record Document 9. For the reasons contained in the instant Memorandum Ruling, the bankruptcy court's ruling is **AFFIRMED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

From late 2011 through mid-2013, Hallwood loaned or guaranteed loans of millions of dollars to MB Industries, LLC ("MBI"). See Record Document 3 at 15-16, 182; Record Document 4 at 51. MBI's obligations to repay its loans to Hallwood are secured by security interests to Hallwood in all of MBI's accounts, inventory, equipment, goods, general intangibles and other collateral. See Record Document 3 at 180. However, after MBI continued to suffer financial difficulties in mid-2013, Hallwood refused to lend any more money to MBI. See id. at 16, 180-82; Record Document 4 at 50-51.

As a result, Frederick Gossen ("Gossen"), the CEO and manager of MBI began searching for new financing to keep MBI afloat. See Record Document 3 at 12, 16. He found Schoonover, who was a successful businessman in the telecommunications industry. See Record Document 4 at 145-147. In 1982, Schoonover had started Fibrebond Corporation, where he served as president and CEO. See id. Fifteen years after starting Fibrebond, Schoonover founded CellXion, Inc., another telecommunications company that was also involved in manufacturing concrete shelters. See id. Schoonover served as CEO of CellXion from 1997 until 2007. See id. While at Fibrebond and CellXion, Schoonover negotiated numerous contracts and had lawyers draft contracts, which he reviewed. See id. Prior to his business career, Schoonover practiced law in Texas in the late 1970s and early 1980s. See id.

In August or September of 2013, Gossen and Schoonover began discussions on a business arrangement involving MBI, including possible loans from Schoonover to MBI and Schoonover's possible acquisition of equity in MBI. See Record Document 3 at 16-20. Schoonover learned from MBI that the Hallwood entities were large creditors of MBI and held security interests in MBI's assets, including inventory, equipment, and accounts receivable. See Record Document 5 at 5-7. On the morning of October 21, 2013, Schoonover sent Gossen an email stating that he wanted Gossen to approach MBI's trade creditors, another MBI creditor, David Dooley, MBI's salesmen, and Hallwood in order to negotiate specific reductions on their claims against MBI. See Record Document 2-16 at 5. He told Gossen: "you have to lead the charge by telling them that I have made no binding offer but if they will agree to the terms I have lined out I will submit a binding offer." Id.

>   As to Hallwood, in this email, Schoonover directed Gossen to:
>
>   [a]pproach Tony [Gumbiner of Hallwood] and tell him I haven't made a binding offer but I believe a deal could be cut to pay them $5 million over 5 years with no interest and one million becoming due each year . . . if the million is not paid by year end then that portion of the million that is not paid starts accruing interest at 6% until it is paid and each year a new one million is due until the 5 million plus interest is paid.

Id. Gossen forwarded this email to Gert Lessing ("Lessing"), the President of HFL and President and Co-CEO of HMB. See Record Document 2-16 at 4. In transmitting that email, Gossen also told Lessing that MBI needed an immediate $1 million cash infusion "today to get projects on schedule . . . and to cover payroll this week." Id.

On the same October morning, Lessing responded to Schoonover's message with the reply (which he repeated twice at Schoonover's and Gossen's request) that "[s]ubject to reaching a definitive agreement with Mr. Steve Schoonover," the Hallwood entities considered Schoonover's emailed proposal to be an acceptable framework under which Hallwood would accept $5 million as payment for all monies due from MBI. Id. Gossen then forwarded one of these Lessing emails to Schoonover's lawyer, John McKnight ("McKnight"), with the following message:

>   Our short term objective is to get an agreement in place that will provide Steve security on [MBI's] receivables that are currently secured to Hallwood, in order for Steve to advance funds. Moreover, [Lessing's] email will encompass the larger scope of the transaction that will need to be papered per Steve's direction.

Id. at 11. Two days later, while on vacation, Schoonover wrote: "[C]all Chris[,] the lawyer who is sitting in for [McKnight]. He has talked with [Hallwood lawyer Alan Kailer] [and] they believe initial is 1M so that covers 500 & 500[,] which would be good if they agree as it will give us more time to [n]egotiate total deal." Id. at 16. Then, on the morning of October 24, Schoonover's lawyers with the Locke Lord firm in Dallas delivered to Alan

Page **3** of **20**

Kailer ("Kailer"), Hallwood's lawyer, a proposed form of subordination agreement. See id. at 22-26. That document stated: "Borrower [MBI] wishes to obtain financing from Lender [Schoonover], and Lender has agreed to provide such financing to Borrower on condition that HFL subordinates to Lender any and all interest which HFL may presently have or may hereafter acquire in and to certain of Borrower's assets." Id. at 22.

At Schoonover's request, on the afternoon of October 24, 2013, Schoonover, Gossen, Lessing, Anthony Gumbiner ("Gumbiner"), a director of both HFL and HMB, and Joe Koenig, an officer for Hallwood, held a 10 minute conference call (the "October 24 conference call"). See Record Document 3 at 26-27, 185. Schoonover was on vacation, and it was the first time Schoonover and Gumbiner had ever spoken. See Record Document 5 at 25, 41. At the trial, Judge Norman heard testimony about this conference call from Schoonover, Lessing, Gumbiner and Gossen. In the Judgment on Partial Findings, the bankruptcy court found:

- "During this brief conference call, Schoonover and Gumbiner discussed an arrangement by which the Hallwood entities would accept a new $5 million promissory note in exchange for the total indebtedness owed to the Hallwood entities by MBI and its affiliates, subject to the requirement that such new $5 million note be made or guaranteed by a well-capitalized or viable entity to be created by Schoonover." Record Document 1-1 at ¶ 33.

- "There was no further discussion during this call as to the meaning of a 'well-capitalized' or 'viable' entity which would be an obligor on this $5 million promissory note. . . . The parties never agreed on the precise meaning of a 'viable' or 'well-capitalized' entity in the context of this framework." Id.

- "During this telephone conversation, the parties agreed to discuss further details of the arrangement upon Schoonover's return from vacation and that any such agreement would be formalized in writing and signed by the parties." Id. at ¶ 34.

- "Schoonover offered for his lawyers to prepare the first draft of such documents and submit them to the Hallwood lawyers for review. Both sides wanted to review the documents promptly; in Schoonover's words, 'the sooner the better.'" Id.

- "During the call, the parties also briefly discussed MBI's pressing cash needs. Schoonover requested that the Hallwood entities subordinate their security interest in MBI's accounts in favor of his proposed loan to MBI. On behalf of the Hallwood entities, Gumbiner agreed to subordinate up to $1 million of the Hallwood entities' security interests in MBI's accounts to any loans by Schoonover to MBI." Id. at ¶ 35.

- "Various subjects were not discussed during the conference call. The parties did not discuss whether, in exchange for this $5 million note, HMB would also relinquish its Class C membership interest in MBI. The parties also did not discuss any period of time or parameters for due diligence activities in connection with this transaction, and the parties did not discuss any representations and warranties that would bind the parties in any such transaction." Id. at ¶ 36.

- "Gumbiner, who is an English solicitor and investment banker with experience in transactions of this type, testified credibly that such proposals are invariably formalized in writing and inclusive of provisions such as representations and warranties by all parties, remedies on default, specification of the objects of the transaction and provisions relating to the performance of due diligence prior to a closing." Id. at ¶ 37.

Shortly after that conference call, Schoonover loaned $500,000 to MBI. See Record Document 2-21 at 57.

Over the next five months, Lessing and Kailer repeatedly asked Schoonover and his lawyer to deliver drafts of the promised definitive documents. See Record Document 2-19 at 123; Record Document 2-14 at 8. Schoonover did not deliver any drafts until late March 2014. See Record Document 2-20 at 57-144.

Meanwhile, Schoonover and Lessing engaged in protracted negotiations over terms of the proposed deal. Just a few days after the October 24 conference call, after Lessing had confirmed that Hallwood would subordinate its security interest in MBI's

accounts only up to $1 million, as specified in the framework for the proposed financing transaction that Schoonover and Hallwood discussed in the October 24 conference call (the "October 24 Framework"), Schoonover re-opened negotiations on that very point. By email to Lessing on October 30, Schoonover said:

> In order to accomplish [paying $5 million to Hallwood] we need uncompromising access to receivables and the proceeds therefrom after the agreement is executed. We are allowing you to keep all other liens until after payment in full. That sounds fair to me.

Record Document 2-16 at 51. Then, less than two weeks later, on November 12, 2014, in response to several Hallwood requests for definitive written documents, Schoonover's lawyer delivered to Hallwood's lawyer "proposed financing transaction" term sheet documents. See Record Document 2-17 at 4. One term sheet outlined a proposed financing and equity transfer set of transactions between MBI and a to-be-formed Schoonover entity, which later became Module X Solutions, LLC ("MXS"). See id. at 5-6. The second term sheet outlined a set of proposed transactions to effectuate the October 24 Framework. See id. at 8-11. Each of these Schoonover-drafted term sheets recite that each is:

> *a non-binding, preliminary term sheet for discussion purposes only*, designed to assist us with our discussion about the captioned potential credit facilities. As such, this term sheet is neither a commitment by any party nor inclusive of all necessary details, agreements, terms and conditions that would be necessary to evidence a final agreement regarding the proposed credit facilities, including, without limitation, mutually acceptable legal documentation. *Any party hereto may terminate or disengage from discussions at any time.*

Id. at 8 (emphasis added). Schoonover received these term sheets, he knew their contents and he never objected to them. See Record Document 5 at 78-79; Record Document 6 at 19-20.

On November 14, 2013, Lessing sent Schoonover an email expressing disagreement with Schoonover's request that Hallwood subordinate its security interest in all accounts receivable and that also listed eight specific points to be resolved to "move forward papering . . . [the] deal," including details regarding the financial viability of the borrower or guarantor of the $5 million note. Record Document 2-17 at 20-21. Days later, after several rounds of negotiations, Schoonover wrote to Lessing:

> I know Tony [Gumbiner] is trying to do what he believes he said he would do and I am trying to do the same. This is the case of "the devil is in the details" as there is no way we discussed all these things in our 5 minute conversation a month ago. . . . What we have is a good faith negotiation of the details. We need to come up with a win win deal that both of us are happy with or let this deal go.

Id. at 30. On November 21, 2013, Schoonover wrote to Lessing that

> I would say that tomorrow is our last day to make a deal . . . It appears that we don't have an agreement and [MBI] is in dire situation. They have needed money for the 2 weeks you and I have been sparring about a few details of our agreement. . . . I think we are basically starting over on our negotiations since we cannot agree on the [intellectual property] or accounts receivable areas which are key to any deal.

Id. at 43.

On November 21, MBI was again in desperate need of funds, and Schoonover was prepared to make another $500,000 loan. He wrote to Lessing: "I have already advanced $500,000 . . . if I advance any more up to $1,000,000 . . [sic] confirm that Hallwood would subordinate their security to that note notwithstanding whether we complete a deal or not." Id. Lessing agreed. See id. at 45. Shortly thereafter, in December 2013, Schoonover and the two Hallwood entities executed separate formal subordination agreements in which the Hallwood entities granted a $1 million limited subordination in their interests in MBI's accounts in favor of Schoonover. See Record Document 2-19 at

76-95. These early December agreements are the only formal, binding agreements ever executed by Hallwood and Schoonover. Those agreements stated in bold print: "**THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES**." Record Document 2-19 at 82, 92.

At the same time that Schoonover was negotiating with Hallwood, he was also negotiating with Gossen for the future ownership and control of MBI. See Record Document 3 at 83-89, 102, 112-113. On December 28, 2013, responding to Lessing's complaints about Schoonover's delay in producing definitive documents, Schoonover wrote back:

> I have been standing by waiting to do exactly what we agreed but had no agreement with Fred [Gossen]. We could in time complete the arrangement as originally planned but that will take time. . . . [A]s far as you are concerned, I feel we have a general agreement that we are both comfortable with. If we reach a new agreement with Fred that will allow our deal to be completed as is or with minor adjustments, I will let you know right away.

Record Document 2-19 at 117.

Prior to that communication, Schoonover had never linked any transaction with Hallwood to his conclusion of a separate contract between him and Gossen. Neither Lessing nor Gumbiner had ever agreed to negotiate toward any transaction with Schoonover that would be conditioned on Schoonover's reaching a separate deal with Gossen. As a result of communications like this one, Hallwood knew the tentative character of its negotiations with Schoonover, and Hallwood never considered itself or Schoonover bound by the October 24 Framework, except to negotiate in good faith in a commercially reasonable manner. See Record Document 3 at 188-189, 191-192; Record Document 4 at 56.

Schoonover and Hallwood continued to negotiate in December and the first months of 2014 while Schoonover continued to negotiate with Gossen over control of MBI. See Record Document 4 at 105, 114-115. Throughout that period, Lessing and Hallwood's lawyer repeatedly asked Schoonover and his lawyers for drafts of the definitive documents. See Record Document 3 at 131; Record Document 4 at 106-110. Without any drafts of definitive documents and with the parties still negotiating unresolved material points of the deal, Schoonover nevertheless loaned more money to MBI. See Record Document 5 at 149; Record Document 2-21 at 57.

On March 8, 2014, Lessing advised Schoonover that Hallwood could not accept changes to the framework, and Schoonover responded the next day:

> It is with somewhat a sense of relief that I got your e-mail as I would have to put in almost $5MM in the next 2 months just to get us even. I might be better with a greenfield startup. I can't believe Tony would take this position as he [is] giving up nothing to see me spend all that money and keep the company running and will make a profit within a few years. I would hope that you would discuss it with him again and we can talk later this evening or in the morning . . . This truly is our last chance for a deal.

Record Document 2-20 at 18. Hallwood refused to reconsider, and yet Schoonover made additional loans to MBI on March 13, March 19 and March 21. See id. at 35; Record Document 2-21 at 57.

In mid-March 2014, Schoonover's lawyers delivered to Hallwood another non-binding proposal concerning the transaction proposed under the October 24 Framework and asked Hallwood to increase its subordination of security interests from $1 million to $3 million. See Record Document 2-20 at 21-26. Lessing rejected both requests and demanded that the parties move directly to final, definitive documents. See id. at 34.

Despite Lessing's rejections, Schoonover made new loans to MBI anyway. See Record Document 2-21 at 57. On March 18, 2014, Schoonover stated: "I can't put any more funds in unless we have some type of memorandum signed that outlines our agreement." Record Document 2-20 at 29. Nevertheless, within the following days, Schoonover loaned more money to MBI. See Record Document 2-21 at 57.

On March 27, 2014, Schoonover's lawyers finally delivered drafts of certain proposed definitive documents, but those drafts were rejected by Hallwood's lawyer on April 2 as unacceptable.[1] See Record Document 2-20 at 57-144; Record Document 1-1 at ¶¶ 79, 80.

On March 31, 2014, Schoonover for the first time demanded that any future deal include a full subordination by Hallwood of its debt to new third party lender debt. See Record Document 2-21 at 1. Hallwood did not agree to this provision, but instead, suggested that it might agree to a full subordination of its security interests in MBI's accounts and inventory if Schoonover provided a $2.5 million personal guaranty. See id. at 10. This proposal went nowhere, and finally, with the impasse in negotiations extending into late April, Gumbiner, Lessing, Schoonover, and Gossen met in Dallas on April 23. See Record Document 3 at 68. Gumbiner gave Schoonover until 5:00 p.m. on April 25 to notify Hallwood of his intention to pursue either the original October 24 Framework, or the $2.5 million personal guaranty option or to pay $3.5 million cash to purchase the Hallwood debt (instead of a $5 million note). See id. at 133-34; Record Document 4 at 28-30. At trial, Judge Norman heard testimony from Schoonover, Lessing and Gumbiner on alleged unsuccessful attempts by Schoonover to speak to Gumbiner and Lessing by phone at

---

[1] Hallwood's attorney notified Schoonover's counsel of 29 separate objections to the proposed Schoonover documentation. See Record Document 2-21 at 5-8.

4:57 p.m. on April 25, but Judge Norman concluded the parties failed to reach any binding agreement. See Record Document 1-1 at ¶¶ 89-92.

On July 31, 2014, Schoonover filed suit in Louisiana state court against Hallwood, alleging claims of breach of contract, detrimental reliance and unjust enrichment. See Record Document 2-2 at 1. After the MBI bankruptcy commenced, Hallwood removed the case to the bankruptcy court on October 24, 2014. See id. at 2-8. Schoonover claimed that based on the October 24 conference call, he and Hallwood had an oral contract with the terms expressed in the October 24 Framework and that Hallwood informed him in April 2014 that it would not comply. See id. at 9-15; 23-37. He alternatively claimed, based on the October 24 conference call and alleged assurances, that he loaned millions of dollars to MBI to his detriment. See id. Finally, he asserted that Hallwood was unjustly enriched by those loans. See id.

On May 15, 2015, Hallwood filed a Motion for Partial Summary Judgment seeking to dismiss Schoonover's claims regarding the October 24 Framework. See Record Document 2-4 at 146. On September 16, 2015, the bankruptcy court entered an Order on Hallwood's Motion for Partial Summary Judgment, granting it in part and denying it in part. See Record Document 2-10 at 49-62. The bankruptcy court granted Hallwood's motion for summary judgment on Schoonover's breach of contract and unjust enrichment claims. See id. However, the bankruptcy court found that material issues of fact remained regarding Schoonover's detrimental reliance claim and denied summary judgment on that claim. See id.

The trial on Schoonover's remaining detrimental reliance claim was held on October 8–9, November 30 and December 1, 2015. See Record Document 1-1 at 4. After

Schoonover presented his case-in-chief, Hallwood moved for judgment on partial findings pursuant to Fed. R. Bankr. P. 7052, which adopts by reference Fed. R. Civ. P. 52. See Record Document 6 at 94. Hallwood argued that Schoonover had (1) failed to prove that his presumptively unreasonable reliance was in fact reasonable, (2) failed to prove that Hallwood made actual representations to Schoonover with any knowledge that Schoonover would rely on them, and (3) that Schoonover failed to prove he advanced any money to MBI based on any actual reliance on statements made by Hallwood. See id. at 94-106. The Bankruptcy Court thereafter granted Hallwood's motion, giving brief oral reasons, followed by a Judgment on Partial Findings Pursuant to Federal Rules of Civil Procedure 52(c) with Findings of Fact and Conclusions of Law, dismissing Schoonover's detrimental reliance claim, and a Judgment, dismissing all of Schoonover's claims. See Record Document 1-1; Record Document 1-2. Schoonover now appeals those judgments, arguing only that the Bankruptcy Court erred in dismissing his detrimental reliance claim. See Record Document 1; Record Document 9.

## II.   LAW AND ANALYSIS

### A.   Jurisdiction and Standard of Review.

This Court has jurisdiction over Schoonover's appeal from the bankruptcy court's Judgment on Partial Findings and Judgment pursuant to 28 U.S.C. § 158(a). In reviewing a decision of the bankruptcy court, this Court functions as an appellate court and applies the standards of review generally applied in a federal court of appeals. See Matter of Webb, 954 F.2d 1102, 1103-04 (5th Cir. 1992). Conclusions of law are reviewed *de novo*. See Matter of Herby's Foods, Inc., 2 F.3d 128, 131 (5th Cir. 1993). Findings of fact are not to be set aside unless clearly erroneous. See id. at 130-31. "A finding is clearly

erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with a firm and definite conviction that a mistake has been committed." Matter of Missionary Baptist Foundation of America, 712 F.2d 206, 209 (5th Cir. 1983). Thus, appellate courts will sustain a bankruptcy court's factual findings "absent a firm and definite conviction that the bankruptcy court made a mistake." In re Ragos, 700 F.3d 220, 222 (5th Cir. 2012) (citation omitted).

**B.     Standards for Detrimental Reliance.**

A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. See La. Civ. Code art. 1967. It is difficult to recover under the theory of detrimental reliance, because estoppel is not favored in Louisiana, and such claims must be examined "strictly and carefully." Louisiana Office of Risk Management v. Richard, 2013-0890 (La. 10/14/13), 125 So.3d 398, 402; Himel Motor Supply of Lafayette v. Genuine Parts Co., 10-1118 (La. 3 Cir. 2/2/11), 2011 WL 309622, *4; see also Moroux v. Tore, 06-831, 832 (La. App. 3 Cir. 11/2/06), 943 So.2d 1263, 1272, writ denied, 07-117 (La. 3/16/07), 952 So.2d 698; May v. Harris Management Corp., 04-2657 (La. App. 3 Cir. 12/22/05), 928 So.2d 140, 144 (citations omitted); Holt v. Bethany Land Co., 36-888 (La. 2 Cir. 5/8/03), 843 So.2d 606, 613.

To be successful, a plaintiff must establish the following four elements: (1) a representation by word or conduct by the defendant-promisor; (2) actual or constructive knowledge of the promisor that his promise would induce the promisee to rely on it; (3) justifiable reliance by the promisee on the promise; and (4) a change in position to the promisee's detriment because of the reliance. See Suire v. Lafayette City-Parish Consol.

Gov't, 04-1459 (La. 4/12/05), 907 So.2d 37, 59; see also La. Civ. Code art. 1967.[2] For reliance to be "justifiable," reliance must be "reasonable." La. Civ. Code art. 1967; State Farm Mut. Auto. Ins. Co. v. Coard, 11-799 (La. App. 4 Cir. 3/28/12), 88 So.3d 1239, 1243. A person may not recover for detrimental reliance based on omissions; there must be a promise. See McLin v. Hi Ho, Inc., 12-1702 (La. App. 1 Cir. 6/7/13), 118 So.3d 462, 470; Wooley v. Lucksinger, 06-1167 (La. App. 1 Cir. 05/4/07), 961 So.2d 1228, 1238-39 (Article 1967 requires a "promise"); Himel, 2011 WL 309622 at *4; Mose v. Keybank Nat. Ass'n, 2011 WL 3204451, *4 (M.D. La. 2011) ("though detrimental reliance may be premised upon an omission, many courts—in furtherance of Louisiana's disfavor of such claims—find that reliance in the absence of a specific promise is unreasonable").

**C.    Analysis.**

In his appeal, Schoonover argues the bankruptcy court erred for the following reasons: (1) the bankruptcy court erred in holding that Schoonover's reliance on statements of Hallwood and their representatives was both presumptively unreasonable and unreasonable as a matter of law; (2) the bankruptcy court erred in finding that "at no time did any of the Hallwood Parties encourage Schoonover to make any of these loans" to MBI, and that "there was no representation by conduct or word between the parties;" and (3) the bankruptcy court erred in concluding the evidence does not establish that Schoonover loaned any money to MBI in actual reliance on any representation by Hallwood. See Record Document 9 at 11-26.

---

[2] La. Civ. Code art. 1967 states:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

### i.    Any Reliance by Schoonover was Unreasonable.

First, Schoonover argues that the bankruptcy court erred in finding his reliance was both presumptively unreasonable and unreasonable as a matter of law. See Record Document 9 at 11. However, Schoonover fails to show why the bankruptcy court's findings of fact were clearly erroneous or why the bankruptcy court was incorrect as a matter of law. He claims the bankruptcy court "pre-decided the matter based on a curriculum vitae approach to detrimental reliance." Record Document 9 at 12. However, this allegation is wholly without merit after considering the relevant jurisprudence and the facts of this case.

Although a plaintiff is not required to prove the existence of a formal, valid and enforceable contract to recover under detrimental reliance, *reliance on a promise "not in the form contemplated by the parties is presumptively unreasonable."*[3] JCD Mktg. Co. v. Bass Hotels and Resorts, Inc., 01-1096 (La. App. 4 Cir. 3/6/02), 812 So.2d 834, 840 (emphasis added), citing Shael Herman, Detrimental Reliance in Louisiana Law—Past, Present, and Future: The Code Drafter's Perspective, 58 Tul. L. Rev. 707, 741 (1984), and Carter v. Huber & Heard, Inc., 95-142 (La. App. 3 Cir. 5/31/95), 657 So.2d 409, 412, writ denied, 95-1662 (La. 10/6/95), 661 So.2d 471 (dismissing detrimental reliance claim based on La. Civ. Code art. 1947, reasoning that "everyone agreed that a written contract was to be executed"); Rogers v. Brooks, 122 Fed.Appx. 729, 733 (5th Cir. 2004) (under La. Civ. Code art. 1947, the parties contemplated a written agreement, and reliance on

---

[3] Additionally, reliance on extra-contractual assurances is unreasonable as a matter of law where a contract has an integration clause stating that the contract can be modified "only 'by written agreement executed by authorized representatives of the parties.'" See Omnitech Int'l, Inc. v. Clorox Co., 11 F.3d 1316, 1328, 1239–40 (5th Cir. 1994). Furthermore, where the law requires a written form, reliance on a promise not in that form is unreasonable. See Morris v. Friedman, 94-2808 (La. 11/27/95), 663 So.2d 19, 25; Amitech U.S.A., Ltd. v. Nottingham Const. Co., 09-2048 (La. App. 1 Cir. 10/29/10), 57 So.3d 1043, 1052; Bernard v. Grefer, 2015 WL 1781674, *9 (E.D. La. 2015).

promises not in that form was unreasonable). Article 1947 of the Louisiana Civil Code is designed to prevent the jilted party from making a detrimental reliance claim when the negotiation process breaks down.[4] See JCD Mktg. Co., 812 So.2d at 841 (quotations omitted).

This is particularly true when there are ongoing negotiations between the parties, and their lawyers are involved in drafting agreements. See Rogers, 122 Fed.Appx. at 732-33 ("[P]arties anticipated entering into a written agreement, and the proposed written agreement contained terms that were not mutually agreeable. Given the amount of on-and-off negotiation that the parties had gone through in the past, any reliance on an alleged promise to sell [by party whose lawyers drafted proposed agreement] was unreasonable."); Velocity Energy Ltd. LLC v. Chevron USA Inc., 204 Fed.Appx. 433, 435 (5th Cir. 2006) (where parties entered into letter of intent "setting forth the preliminary agreements between the parties for the possible sale of several offshore mineral properties," which was a "classic example of a non-binding agreement, . . . [a]ny detrimental reliance . . . upon the letter of intent was presumptively unreasonable"); Bluebonnet Hotel Ventures, LLC v. Wachovia Bank, N.A., 2013 WL 3423106, *6 (M.D. La. 2013). Where parties' communications show that they do not intend to be bound until additional proposed terms are agreed upon, reliance on representations made in those communications is unreasonable. See Ballard v. XTO Energy, 784 F. Supp. 2d 635, 641 (W.D. La. 2011) ("Plaintiff's reliance was unreasonable. Given the language of the parties' email communications, Plaintiff reasonably knew or should have known that Defendant

---

[4] Schoonover argues that "Article 1947 does not logically apply to Article 1967;" however, it is clear that Louisiana courts have routinely applied Article 1947 in its detrimental reliance analysis.

would not be bound until the additional proposed terms were acknowledged and a written contract was consummated.").

Furthermore, when the person claiming detrimental reliance is a sophisticated businessperson, the bar for reasonable reliance is higher. See John W. Stone Oil Distributor, L.L.C. v. River Oaks Contractors & Developers, 07-1001 (La. App. 5 Cir. 5/27/08), 986 So.2d 103, 109 ("It is not reasonable for a sophisticated businessman . . . to rely on an oral contract to sell immovable property given the firmly rooted statutory law and jurisprudence requiring such agreements to be in writing."); East Tangipahoa Dev. Company, LLC v. Bedico Junction, LLC, 08-1262 (La. App. 1 Cir. 12/23/08), 5 So.3d 238, 247 (unreasonable to rely on oral sale of immovable property where plaintiff "in addition to being a businessman, . . . [was] an attorney"); Oliver v. Central Bank, 26,932 (La. App. 2 Cir. 5/10/95), 658 So.2d 1316, 1323; SJB Group, LLC v. TBE Group, Inc., 2013 WL 6194571, *12 (M.D. La. 2013).

All of the factors in which courts have found a plaintiff's reliance to be unreasonable are present in this case. The bankruptcy court found:

- Schoonover, Gumbiner, Lessing and Gossen—all parties to the October 24 conference call—agreed that any binding agreement concerning Hallwood's sale of its $13 million in rights against MBI must be formalized in a signed, written agreement. See Record Document 1-1 at ¶40.

- The parties did not address or resolve several material details of any "deal" during this conference call, and the parties discussed resolving them later. Id. at ¶¶ 33, 36.

- During this October 24 conference call, Schoonover offered his own lawyers to prepare these definitive written agreements and that all parties expected these documents to be drafted and circulated in a matter of weeks. See id. at ¶ 34.

- Schoonover and his lawyers inexplicably failed to prepare and circulate to Hallwood any drafts of these definitive documents for almost five months and that during that entire period, Hallwood representatives were repeatedly asking Schoonover about the status of these documents. See id. at ¶ 43.

- On multiple occasions during that five months, Schoonover's own lawyers–with Schoonover's knowledge—delivered non-binding term sheets and letters of intent to Hallwood which stated that no party was bound to any agreement until future definitive documents were prepared, agreed to and signed by all parties. See id. at ¶¶ 49, 70–71.

- Throughout the period of time when Schoonover was loaning money to MBI, he and Hallwood representative Gert Lessing were still negotiating on material terms to the proposed definitive agreements and that many of these terms were never resolved. See id. at ¶ 107.

- Schoonover is a lawyer and successful entrepreneur in the telecommunications industry, building Fibrebond and CellXion into successful companies. Schoonover was actively involved in negotiating contracts and business arrangements on behalf of both companies. See id. 1-1 ¶¶ 12, 15.

Based on these findings of fact, which Schoonover does not challenge in this appeal, the bankruptcy court did not err as a matter of law in its ruling. Schoonover's alleged reliance on any promises of Hallwood was unreasonable. Accordingly, Schoonover's detrimental reliance claims must fail.

Schoonover seeks to undermine the foregoing by arguing that "it is irrelevant under the Louisiana law of detrimental reliance whether the parties intended to be (or actually were) bound under a contract or a contemplated contract." Record Document 9 at 9. While that statement may be true, it does not bear on this Court's analysis. Although Schoonover is not required to prove a binding contract to establish a claim for detrimental reliance, he must establish that he was reasonable in acting under the circumstances. When, as here, Schoonover and Hallwood jointly contemplated a written, signed

agreement to memorialize any contract, Louisiana law is clear that it is presumptively unreasonable for Schoonover to act in derogation of that joint understanding.

Finally, Schoonover argues that the legal presumption that parties do not intend to be bound prior to an executed agreement can be rebutted when a party actually performs without a written agreement. See Record Document 9 at 14. Schoonover then alleges that he performed under the proposed Hallwood transaction by loaning money to MBI even though the final documents to the Hallwood transaction were never signed. See id. at 15. As support for that argument, however, Schoonover quotes at length two cases— Enterprise Property Grocery, Inc v. Selma, Inc., 38,757 (La. App. 2 Cir. 9/22/04), 882 So.2d 652,[5] and Lakeshore Engineering Services v. Target Construction, Inc., 2 F. Supp. 3d 1038 (E.D. Mich. 2014)[6]—that are irrelevant in the Court's detrimental reliance analysis. Instead, those cases concerned the acceptance, i.e., consent, to a completed, written contract by performance of the party against whom the contract was sought to be enforced.

Whether a party actually accepted a completed, written contract has no relation to whether it was reasonable for Schoonover to advance funds in alleged reliance on negotiations when Hallwood and Schoonover never had a completed, written contract as they had contemplated. It also is irrelevant as to whether Schoonover was reasonable in

---

[5] In Enterprise, the court determined that lessees of an expired lease accepted a new, written lease by making payments on the rent in the amount stated in the lease and was thus bound by the lease. See Enterprise, 882 So.2d at 656. The court stated: "[W]e find that there was an agreement between plaintiff and defendant with respect to the terms of the written lease . . . and the trial court was clearly wrong in finding that the lease did not take effect without the plaintiff's signature." Id.

[6] In Lakeshore, the court found an arbitration clause in a subcontract was valid because the party against whom it was asserted had accepted the written subcontract by performing under the subcontract. See Lakeshore, 2 F. Supp. 3d at 1047-50. The plaintiff had sent a signed counteroffer, and the defendant began performing. See id. Because the written and completed subcontract was accepted, the arbitration clause was valid. See id.

relying on statements in negotiations for the proposed deal under the October 24 Framework.

## CONCLUSION

The uncontroverted facts here are that the parties intended to be bound only by written, definitive documents. Reliance made on a promise related to a contract that was never completed as a written, definitive document is unreasonable under Louisiana law. Accordingly, the bankruptcy court did not err in finding Schoonover's reliance was both presumptively unreasonable and unreasonable as a matter of law. The judgment of the bankruptcy court is **AFFIRMED**.[7]

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this 20th day of July, 2018.

_____
S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[7] Because the Court finds the bankruptcy court did not commit reversible error on this issue, Schoonover's remaining arguments need not be addressed.